**IN THE UNITED STATE BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| ZAMBRANO CORPORATION, | : | Bankruptcy No. 09-20453JAD |
| | : | |
| Debtor. | : | Chapter 7 |
| _____ X | : | |
| | : | |
| ROSEMARY C. CRAWFORD, Trustee | : | Adversary No. 09-2045JAD |
| of the Estate of Zambrano Corporation, | : | |
| | : | |
| Plaintiff, | : | Doc. No. 46 |
| v. | : | |
| | : | |
| EUGENE ZAMBRANO, III, | : | |
| | : | |
| Defendant. | : | |
| _____ X | : | |
| | : | |
| ROSEMARY C. CRAWFORD, Trustee | : | Adversary No. 11-2123JAD |
| of the Estate of Zambrano Corporation, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | Doc. No. 1 |
| | : | |
| HILLCREST DEVELOPMENT | : | |
| ASSOCIATES, LP, | : | |
| | : | |
| Defendant. | : | |
| _____ X | : | |
| | : | |
| ROSEMARY C. CRAWFORD, Trustee | : | Adversary No. 11-2122JAD |
| of the Estate of Zambrano Corporation, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | Doc. No. 1 |
| | : | |
| EUGENE ZAMBRANO, JR., Individually | : | |
| and Jointly with MARY ZAMBRANO, | : | |
| his wife, | : | |
| | : | |
| Defendants. | : | |
| _____ X | | |

This *Memorandum Opinion* constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052. The matters before this Court are three jointly tried adversary proceedings commenced by Rosemary C. Crawford, Chapter 7 trustee (the "Trustee") of the estate of Zambrano Corporation (the "Debtor"), against Eugene Zambrano, III ("EZIII"), Hillcrest Development Associates, LP ("Hillcrest"), and Eugene Zambrano, Jr. ("EZJr") and his wife, Mary Zambrano ("Mary"). Pursuant to adversary proceeding 09-02045-JAD, the Trustee contends that EZIII breached his fiduciary duty to the Debtor under Pennsylvania law and that EZIII deepened the Debtor's insolvency under Pennsylvania law. Pursuant to adversary proceeding 11-02123-JAD, the Trustee contends that Hillcrest was the transferee of an avoidable fraudulent transfer from the Debtor under 11 U.S.C. § 548. Pursuant to adversary proceeding 11-02122-JAD, the Trustee contends that EZJr and Mary were the beneficiaries of avoidable fraudulent transfers from the Debtor under 11 U.S.C. §§ 548 and 550.

Adversary proceedings 11-02122-JAD and 11-02123-JAD are core proceedings over which this Court has jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(A) and (H) and 28 U.S.C. § 1334. This Court has jurisdiction over adversary proceeding 09-02045-JAD pursuant to 28 U.S.C. § 157(c) and 28 U.S.C. § 1334. The matters within adversary proceeding 09-02045-JAD are not core proceedings but are otherwise related to a case under title 11; all parties have consented to this Court to hear and determine the proceedings related to a case under title 11 and to enter appropriate orders and judgments pursuant

to 28 U.S.C. § 157(c)(2). (See Adv. No. 09-02045-JAD, Doc. #79, *Order Approving Joint Discovery Plan*, ¶ 4).

In his *Pre-Trial Statement*, EZIII relies on the recent Supreme Court decision in Stern v. Marshall, --U.S.--, 131 S. Ct. 2594 (2011), to argue that this Court lacks the ability to enter a final judgment on the Trustee's state law claims. (Adv. No. 09-2045-JAD, Doc. # 109, pp. 4 - 5). This Court rejects EZIII's assertion because both parties have consented to the entry of a final judgment by this Court. (See Adv. No. 09-02045-JAD, Doc. #79). Such consent is sufficient to allow this Court to hear and finally determine the instant matters, regardless of whether they are statutorily defined as "core" or "non-core," pursuant to 28 U.S.C. § 157(c)(2). ARDI Limited Partnership v. The Buncher Company, (In re River Entertainment Co.), 467 B.R. 808 (Bankr. W.D. Pa. 2012) (parties' consent to entry of final judgment by the bankruptcy court permits final adjudication by non-Article III bankruptcy courts of non-core and core matters alike as Stern v. Marshall did not impact the consent provision of 28 U.S.C. § 157).

For the reasons set forth below, the Court finds EZIII liable for the Trustee's count of breach of fiduciary duty to the Debtor. However, the Court finds the Trustee's argument concerning EZIII's liability as to deepening insolvency unpersuasive. Additionally, the Court finds Hillcrest liable for the value of the fraudulent transfer it received from the Debtor, and the Court finds EZJr liable for the value of the fraudulent transfers, from which he benefited, from the Debtor. Lastly, the Court finds the Trustee's argument that Mary is

also liable as a beneficiary of the fraudulent transfers from the Debtor unpersuasive.

## I.

The Debtor is a Pennsylvania corporation that previously engaged in the business of general contracting, construction, and real estate development. EZJr was the principal of the Debtor from the Debtor's inception until 2003. In December of 2003, EZIII purchased his father's interest in the Debtor and several related entities by means of a private annuity contract ("Annuity Contract") between Hillcrest and EZJr. (Adv. No. 09-2045-JAD, Defendant's Exhibit S)[1]. EZIII was the principal of the Debtor and the Debtor's one-hundred percent shareholder from 2003 through the bankruptcy filing on January 26, 2009 (the "Petition Date"). (See Doc. #105, *Plaintiff's Statement of Facts to be Proved*, ¶ 6).[2]

On the Petition Date, five of the Debtor's unsecured creditors commenced an involuntary Chapter 11 in this Court. (See id. at p. 5). After the entry of an order for relief, the Debtor's bankruptcy case was later converted from a Chapter 11 reorganization to a Chapter 7 liquidation. (See Case No. 09-20453-JAD, Doc. #256). The Trustee was appointed as the trustee for the bankruptcy estate of the Debtor following conversion of the Debtor's bankruptcy case to a

---

[1] All future docket citations refer to Adversary Number 09-2045-JAD, unless otherwise specifically noted.

[2] Through the Pretrial Stipulation Required by September 19, 2011, Scheduling Order (Doc. #14), the parties stipulated to certain facts contained in the Plaintiff's Statement of Facts to be Proved (Doc. #15).

case under chapter 7 of the Bankruptcy Code on June 26, 2009. (See Case No.
09-20453-JAD, Doc. #257).

A.

In addition to acting as the sole shareholder and director, as well as the
controlling officer and President of the Debtor, EZIII also owned a 50% interest
in Hillcrest. (See Plaintiff's Exhibit 7, pp. 13-37). Various other members of
EZIII's family owned 49% of Hillcrest. EZIII also owned directly, or indirectly
through Hillcrest, an interest in several other entities (collectively, the
"Affiliated Entities"). (See Audio Recording of Hearing Held in Courtroom D,
February 13, 2012 (10:31 - 10:39 AM); see also Plaintiff's Exhibit 7).

Until January 1, 2007, Hillcrest owned a 50% interest in 151 First Side
Associates, LLC ("First Side"). First Side was a partner in 151 First Side
Associates, LP, a condominium development located in Pittsburgh,
Pennsylvania. As of January 1, 2007, EZIII's interest in First Side was reduced
to a 33.3% interest and assigned to the Debtor. (See Audio Recording of
Hearing Held in Courtroom D, February 13, 2012 (10:38 - 10:40 AM)).
Notwithstanding the reduction of his equity interest, EZIII still maintained a
significant continuing interest with respect to First Side's operations as he
personally guaranteed certain bank loans to fund the First Side Associates, LP
project. (See id.).

Each of the Affiliated Entities was linked to a development project in
which the Debtor acted as the general contractor, or provided construction
services. The practice of the Debtor providing benefits to the entities linked to

the development projects for which the Debtor provided construction services was allegedly long established and predated EZIII's 2003 takeover of the Debtor. (See id.). Among the types of benefits the Debtor regularly bestowed on the Affiliated Entities was allowing account receivables ("ARs") to go uncollected for a period of time and to accrue unbilled work in progress ("WIP"). Stated in other terms, it appeared that the Debtor provided substantial construction related services to the Affiliated Entities for little or no remuneration during the time period at issue. Additionally, the Debtor made undocumented, uncollateralized, interest free loans to insiders of the Debtor and to the Affiliated Entities (the "Loans").

B.

Hillcrest was one of the Affiliated Entities that received benefits from the Debtor.  Hillcrest is the estate planning vehicle through which EZIII purchased all of the assets, including the interest in the Debtor, held by EZJr. (See Audio Recording of Hearing Held in Courtroom D, February 13, 2012 (1:20 - 1:23 PM)).

On or about July 11, 2007, the Debtor transferred $150,000 to Hillcrest so that Hillcrest could become a partner in a hotel development project. (See Plaintiff's Exhibit 15, unnumbered p. 1). The Hillcrest check register shows a payment of $150,000 that same date to "Hot Metal Bridg...." (See id.). Hillcrest alleges that it intended to repay the money with interest upon the first partnership distribution. (Adv. No. 11-2123, Doc. #8, *Pretrial Statement Required by April 11, 2011, Scheduling Order*, ¶ 5).

Subsequently, Hillcrest's partner allegedly breached its obligations under the partnership and Hillcrest demanded dissolution of the partnership. (Id.). The Hillcrest check register shows the $150,000 as the first and last distribution of the partnership as the return of the investment to Hillcrest on September 11, 2008. (Plaintiff's Exhibit 15, unnumbered p. 7).

Hillcrest did not return any funds to the Debtor. Rather, the entire balance of the returned loan funds were dissipated, with Hillcrest distributing $80,420.77 to members of the Zambrano family over the ensuing thirty day period. (See id.; see also Adv. No. 11-2123-JAD, Doc. #8, ¶ 10).

<u>C.</u>

Not only did Hillcrest and the other Affiliated Entities receive benefits from the Debtor, but EZJr, the former principal of the Debtor, also received benefits. Under the arrangement whereby EZIII purchased all of the assets held by EZJr, EZJr received monthly cash payments of $21,400 from Hillcrest pursuant to the terms of the Annuity Contract. In addition to the monthly cash payments from Hillcrest, the Debtor paid EZJr's real estate and income taxes, health insurance premiums, and vehicle lease payments. (See Audio Recording of Hearing Held in Courtroom D, February 13, 2012 (2:33 - 2:35 PM)).

In 2008 and 2009, the Debtor also paid for EZJr's leased vacation condominium unit known as Unit No. 3H of the Marbella Condominium located in Boca Raton, Florida (the "Condo Unit"). For both the 2008 and 2009 lease terms, EZJr executed a lease agreement for the Condo Unit indicating that it was to be occupied by two persons for the purpose of vacation. (Adv. No. 11-

2122-JAD, Plaintiff's Exhibits 3, 4). EZJr was the only prospective tenant to sign each lease. (See id.).

The Debtor issued checks in the amount of $22,400 and $2,000 dated November 8, 2007[3] for amounts due under a four month lease of the Condo Unit for the 2008 vacation season. (Adv. No. 11-2122-JAD, Plaintiff's Exhibit 1, p. 9). The Debtor also issued checks in the amounts of $22,300 and $2,000 each dated November 14, 2008 for amounts due under a four month lease of the same Condo Unit for the 2009 vacation season. (See id.).

EZJr testified that his wife, Mary, was not listed as a lessee or a tenant on the lease. (See Audio Recording of Hearing Held in Courtroom D, February 13, 2012 (2:41 - 2:43 PM)). EZJr also testified that Mary would only stay at the Condo Unit for two or three days at a time, as she would drive to Florida and fly back to Pittsburgh once he was settled, returning only to stay for a few days and pick up EZJr at the end of the lease term. (See id.). EZIII explained that it was solely his decision to have the Debtor pay for EZJr's vacation rental of the Condo Unit (See id. at (2:28 - 2:30 PM)), and he felt EZJr was "entitled" to the benefit as the past president of the Debtor (See id. at (2:04 - 2:06 PM)).

## II.

Adversary No. 09-2045-JAD began as a civil action filed by a single creditor against the Debtor and EZIII in the Court of Common Pleas of

---

[3] The Trustee's Complaint alleges that the $2,000 check was issued on November 8, 2008. (See Adv. No. 11-2122-JAD, Doc. #1, Complaint, p. 9). However, based on the check number, the Court believes this date to be a typographical error and finds that the check was issued in 2007.

Allegheny County. (See Doc. #105, ¶ 2).   Following the commencement of the involuntary bankruptcy case against the Debtor, EZIII removed the civil action to this Court. Thereafter, the Trustee was substituted as the real party in interest pursuant to an order of this Court entered February 1, 2010. The Trustee filed an *Amended Complaint* asserting seven Counts against EZIII. The *Amended Complaint* avers that despite EZIII's ongoing knowledge of the Debtor's deteriorating financial condition, he caused the Debtor to engage in a pattern of activity that advanced his own self-interest at the expense of the Debtor and its creditors. (Doc. #46, ¶¶ 8, 27-29).

On October 6, 2010, EZIII filed an *Answer*[4] to the *Amended Complaint* asserting several affirmative defenses. On November 30, 2010, this Court entered an Order approving the *Joint Discovery Plan and Statement of Estimated Time of Trial* which allowed 180 days for discovery beginning

---

[4] In response to the *Amended Complaint*, EZIII originally filed a *Motion to Dismiss Pursuant to Bank. Rule 12(b) and Fed.R.Civ. P. 12(b)(1)* and a *Reply Brief in Support of Motion to Dismiss*, arguing that all counts should be dismissed.  EZIII argued at that time that this Court lacked subject-matter jurisdiction.  In support, EZIII alleged that the Trustee abandoned all of the Debtor's receivables to the primary secured creditor of the estate, TriState Capital Bank ("TriState").  As such, EZIII alleged that the Trustee lacked standing as the Trustee's complaint complained of outstanding and unpaid receivables due by the Debtor and caused by EZIII's breach of fiduciary duty. EZIII also argued that all counts should have been dismissed because the Trustee failed to join TriState as an allegedly indispensable party.  This Court denied the motion to dismiss on August 24, 2010 for the following reasons: (a) This Court granted relief to TriState from the automatic stay and for abandonment of certain of its collateral.  However, the relief was limited to TriState's interest in "Real Estate" and "Collateral." Nothing in TriState's motion provided for the abandonment of the breach of fiduciary / fraudulent conveyance causes of action at issue; (b) the  Trustee has standing, and this Court has subject matter jurisdiction, as the causes of action constitute estate property; (c) TriState is not a "necessary and indispensable party" to this litigation because the lawsuit does not adjudicate any independent rights or claims of Tri-State; and (d) the Court is able to accord complete relief between the parties to this litigation without joining TriState.

December 23, 2010. As part of the November 30th Order, the parties agreed to the entry of a final order by this Court. (Doc. #79).

On February 25, 2011, the Trustee filed adversary complaints against EZJr and Mary at Adversary No. 11-2122-JAD and Hillcrest at Adversary No. 11-2123-JAD. The Court entered Orders dated October 19, 2011, granting the respective defendants' requests to have these additional adversaries tried jointly with Adversary No. 09-2045-JAD. (See Adv. No. 11-2123-JAD, Doc. #20; Adv. No. 11-2122-JAD, Doc. #25).

Following a series of status conferences held March 29, 2011, July 12, 2011, and September 19, 2011, this Court entered an Order scheduling the combined adversary proceedings for trial on February 13, 2012. At the conclusion of the trial, this Court requested that the parties submit their closing arguments in the form of concurrent post-trial briefs on or before March 12, 2012, with optional replies two weeks thereafter. The parties have each filed post-trial briefs and responses. The matters are now ripe for adjudication.

### III.

Although alleging seven counts in the *Complaint*, the Trustee proceeded on two against EZIII: (1) breach of fiduciary duty; and (2) deepening insolvency. The Trustee proceeded on the legal theory of fraudulent transfer against Hillcrest, EZJr and Mary, with the Trustee having abandoned the preferential transfer claims against such parties. At the conclusion of trial, EZIII and Hillcrest both asserted the same affirmative defenses asserted in the *Motion to*

*Dismiss* as described in footnote 4 above. For the reasons detailed in footnote 4 above, those affirmative defenses are unpersuasive and the Court's ruling with respect to the same are law of the case. See Crow v. Washington County Bd. of Prison Inspectors, 504 F. Supp. 412 (W.D. Pa. 1980) (law of the case doctrine precluded court from considering a motion to dismiss after prior judge had dismissed an earlier motion to dismiss in the same case).

After first determining the Debtor's insolvency date in *Memorandum Opinion* Section III, Subsection A, this Court will address the merits of the remaining claims against EZIII in Section IV, those against Hillcrest in Section V, and those against EZJr and Mary in Section VI.

<u>A.</u>

Each claim that the Trustee asserts against the respective defendants hinges largely on when the Debtor became insolvent. The Court reaches this conclusion because the period of time when EZIII owed the creditors of the Debtor a fiduciary duty is dependent on when the Debtor became insolvent. Similarly, a deepening-insolvency cause of action requires that the Debtor be insolvent. Furthermore, an element of the fraudulent transfer claims against the defendants requires that the Debtor be insolvent. As set forth more fully below, this Court determines that the Debtor became insolvent on September 30, 2007 (the "Insolvency Date").

As the controlling officer and President of the Debtor, EZIII received monthly financial reports concerning the deteriorating financial condition of the Debtor (See Audio Recording of Hearing Held in Courtroom D, February 13,

2012 (11:15 - 11:17 AM)), and reviewed annual Financial Statements for each fiscal year that ran from October 1 of the prior year through September 30 of the following year (See id. at (10:46 - 10:48 AM)). However, EZIII testified that there was a "five or six month lapse or lag time" between the date of the financial reports and the time when he would receive an audited copy for review. (See id. at (11:14 - 11:16 AM)). EZIII admits that he became aware of the contents of the September 30, 2007 Financial Statement in either March or April of 2008. (See id. at (1:51 - 1:53 PM)).

It is undisputed that as of September 30, 2007 the Debtor's current liabilities exceeded its current assets by $139,317.00. (See Plaintiff's Exhibit 1, p. 29). However, the negative equity position of the Debtor's shareholder may have been even worse. After examining the Debtor's September 30, 2007 Financial Statement, the Trustee's financial expert, Mr. Thomas Golden (the "Financial Expert"), testified that the Debtor was insolvent by approximately $6,691,476 as of September 30, 2007. (See Plaintiff's Exhibit 9, p. 1).

The Debtor's shareholder equity calculation of negative $139,317.00 is based on booked assets of $17,380,699 and liabilities of $17,520,016. (See Plaintiff's Exhibit 1, pp. 28-29). However, according to the Financial Expert, the September 30, 2007 Financial Statement substantially overvalues certain of the Debtor's assets. (See Audio Recording of Hearing Held in Courtroom D, February 13, 2012 (2:57 - 2:59 PM)).

For example, while booked with an asset value of $2,000,000,[5] the Financial Expert explained that the Debtor's interest in First Side had an actual value of $0.00. (See Plaintiff's Exhibit 9, pp. 11-12). The Financial Expert explained that this "investment" was worthless because a review of the First Side condominium units sold in 2007 resulted in a net loss of $1,211,999 (or negative 7.25%). (See id.). Thus, while booked as an investment, the profit share of the units would actually be in the negative, and thus, worth nothing. (See Audio Recording of Hearing Held in Courtroom D, February 13, 2012 (3:14 - 3:16 PM)). The Financial Expert's opinion that the First Side investment was "worthless" was confirmed in an accounting projection completed on behalf of 151 First Side Associates, LP. After subtracting the sum of the cost of completing and selling the units and the debt with priority over equity from the amount of income that would be generated by the sale of all remaining available condominium units at their then asking price, a third-party accountant projected a total net loss on the project of $588,956. (See Plaintiff's Exhibit 9, p. 13).

More significantly, the total booked asset value associated with another project of the Debtor, the Chapel Harbors project, was listed as $5,984,324.43.[6] However, the Financial Expert opined that the value of the

_____

[5] This "asset" is booked on the September 30, 2007 Financial Statements as "Investment in and advances to unconsolidated affiliate at cost plus equity in undistributed earnings." (See Plaintiff's Exhibit 1, p. 28).

[6] This figure is based on combined figures on the September 30, 2007 Financial Statement $156,181.57 that had been booked as affiliate loans or "Due from affiliates," $693,539.86 in accounts receivable booked as "contract receivables including

Chapel Harbors project should be written down significantly, resulting in an overall conservative write-down of the actual asset value of the Chapel Harbors project by $4,888,154.43. (See Plaintiff's Exhibit 9, p. 10). The Financial Expert determined that after subtracting the contractual sale costs[7] from a contracted gross revenue of $6,600,639, and after paying off secured creditors, the Debtor would be left (as its pro-rata portion the remainder shared with other unsecured creditors) with approximately $1.1 million on the Chapel Harbors project. (See Plaintiff's Exhibit 9, pp. 10-11). During his testimony, EZIII essentially agreed with this figure, estimating that the Debtor would only be able to collect approximately $1.2 million from the remaining lot sales in the Chapel Harbors project. (See Audio Recording of Hearing Held in Courtroom D, February 13, 2012 (11:19 - 11:22 AM)).

There are several other adjustments mentioned by the Financial Expert in his testimony that, when combined with the figures listed above, would ultimately result in a total negative equity figure of $6,702,731 as of September 30, 2007. (See Plaintiff's Exhibit 9, p. 1). It therefore appears to the Court that the Debtor's financial condition was actually much worse than what is evidenced by the September 30, 2007 Financial Statement.

---

retainages, less allowance for doubtful accounts," and $5,134,603 in unbilled work in progress booked as "Costs and estimated earnings in excess of billings on uncompleted contracts." (See Plaintiff's Exhibit 1, p. 28).

[7] These contractual costs include a contractual sale price reduction per lot, the Debtor's liability for a portion of the real estate transfer tax and closing costs for each lot sold. (See Plaintiff's Trial Exhibit 1, Request for Admission #28).

In response to the allegation of insolvency, EZIII presents two unpersuasive arguments. First, EZIII alleges that he was not concerned about solvency because of the profit expected from a "significant contractual backlog" of work contracted for the 2008 fiscal year and work that was to be contracted.[8] (See Audio Recording of Hearing Held in Courtroom D February 13, 2012 (1:53 - 1:56 PM)). Initially, none of the alleged work that was to be contracted was booked as of the September 30, 2007 Financial Statement. As a result, any expected profit that would have derived from this work cannot impact the solvency of the Debtor as of the date in question.

Further, EZIII's claims that profits from work to be performed in current contracts would help ensure the solvency of the Debtor are belied by an examination of the Debtor's estimated gross profit on incomplete jobs and the Debtor's indirect costs of operation. Examining the Debtor's Schedule of Contracts in Progress for the Year Ended September 30, 2008, there was an estimated gross profit on remaining contracts for the year of $6,248,664. (See Plaintiff's Exhibit 6, p. 138). However, with only approximately $20 million left to be billed, this projected gross profit number appears to be exceedingly high based on the admitted market standards of an approximate 5% profit on contracting jobs. (See Audio Recording of Hearing Held in Courtroom D,

---

[8] EZIII also suggested that he was not concerned about the financial condition of the Debtor, because the Debtor had secured the use of a $6 million line of credit from Tri State Capital Bank. (See Audio Recording of Hearing Held in Courtroom D, February 13, 2012 (1:55 - 1:57 PM)). However, any cash realized from a draw on this line of credit would be offset by the Debtor's liability for the amount borrowed and, thus, have no bearing on whether the Debtor was "balance sheet" insolvent as of September 30, 2007.

February 13, 2012 (2:09 - 2:12 PM)). Thus, a more reasonable expected gross profit for the fiscal year ending September 30, 2008, would have been approximately $1.2 million.[9] The Debtor's indirect costs of operation for fiscal year running from October 1, 2007 through September 30, 2008 were $2,479,243. (See Plaintiff's Exhibit 1, p. 53; see also Audio Recording of Hearing Held in Courtroom D, February 13, 2012 (2:12 - 2:13 PM)). Taking these figures together, it appears as though the Debtor's profit would have only been enough to cover approximately one-half of the Debtor's annual indirect costs, establishing that EZIII's optimistic impression of the future profits of the company is not reasonable.

Second, EZIII alleges that the Debtor was going to be repaid for its loans to and work on the Chapel Harbor project "based on the sale proceeds of the Marbella Condominium Project." (See Audio Recording of Hearing Held in Courtroom D, February 13, 2012 (11:19 - 11:21 AM), (1:39 - 1:41 PM)). However, EZIII admitted that there is no documentation indicating that the proceeds from the Marbella Project were ever assigned or pledged to the Debtor. (See id. at (2:20 - 2:23 PM)). As a result, this expectation of profit cannot be included on the balance sheet of the Debtor to indicate that the Debtor was somehow solvent.

EZIII admittedly understood that as of September 30, 2007, his current liabilities exceeded the value of his current assets. (See id. at (11:17 - 11:19

---

[9] Additionally, the estimated gross profit number of $6,248,664 includes an anticipated profit on the Chapel Harbors project of $1,275,706, which, based on the analysis of the true value of that project, is not tenable.

AM); see also Plaintiff's Trial Exhibit 1, p. 29)). Additionally, EZIII admitted that he was aware that the Debtor had lost money in 2006 and 2007, and continued to lose money from September 30, 2007 through the date of the bankruptcy filing. (See id. at (11:15 - 11:17 AM), (11:23 - 11:25 AM)). Notwithstanding his recognition of the Debtor's financial "need" as of September 30, 2007, EZIII admits that he continued to cause the Debtor to expand the amount of Loans, unbilled WIP, and uncollected ARs. (See id. at (11:22 - 11:24 AM)).

As of September 30, 2007, the amount of outstanding Loans was $1,322,929. (See Plaintiff's Exhibits 5, 6, 20). Between the conclusion of the Debtor's fiscal year on September 30, 2007 and the involuntary petition date on January 26, 2009, the amount had increased to $2,112,255. (See Plaintiff's Exhibits 19, 20).

As of September 30, 2007, there was $10,552,397 in uncollected ARs and unbilled WIP due and owing from the Affiliated Entities. (See Plaintiff's Exhibit 20). By the time of the involuntary filing date, January 26, 2009, the total amount of uncollected ARs and unbilled WIP due and owing from the Affiliated Entities had reached $14,314,340. (Id.).

In addition to admitting that the Loans were interest free, EZIII admitted that the Loans were not the product of arm's length transactions because the Loans contained no terms and were not collateralized. (See Audio Recording of Hearing Held in Courtroom D, February 13, 2012 (11:04 - 11:06 AM)). EZIII also admitted that no third party lender would make similar loans (See id.).

Thus, given all of the evidence summarized above, this Court concludes that the Debtor became insolvent no later than September 30, 2007 and remained so through the Petition Date.

## IV.

Pursuant to adversary proceeding 09-2045-JAD, the Trustee asserts claims against EZIII for breach of fiduciary duty and deepening insolvency. For the reasons stated herein, this Court finds convincing the Trustee's claim for breach of fiduciary duty, but is not persuaded by its claim for deepening insolvency.

## A.

The Trustee alleges that while the Debtor was insolvent, EZIII breached his fiduciary duty thereby injuring the Debtor's creditors.

Pennsylvania law codifies the fiduciary duties owed to a corporation by directors at 15 Pa. Cons. Stat. Ann. § 1712; Section 1712(a) applies to directors while Section 1712(c) applies to officers. Under the statute, an officer or director "shall perform his duties … in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances." 15 Pa. Cons. Stat. Ann. § 1712.

Two duties make up the fiduciary duties imposed upon officers and directors of a corporation: the duty of care and the duty of loyalty. The United States Court of Appeals for the Third Circuit has stated, "A director's duty of

care requires him to 'discharge duties to the corporation with the same diligence, care, and skill which ordinary prudent persons exercise in their personal affairs; failure to exercise such care renders any corporate director liable for resulting corporate losses.'" Payne v. Lampe (In re Lampe), 665 F.3d 506, 515 (3d Cir. 2011) (citing Miller v. Blatstein (In re Main, Inc.), 239 B.R. 281, 291 (Bankr. E.D. Pa. 1999)). Meanwhile, a director's duty of loyalty requires him to promote the interests of the corporation rather than his own interests while dealing with corporate affairs. Lampe, 665 F.3d at 515 (citing Anchel v. Shea, 762 A.2d 346, 357 (Pa. Super. Ct. 2000); Fitzpatrick v. Shay, 461 A.2d 243 (Pa. Super. Ct. 1983)).

When a corporation is solvent, the officer and director owes a fiduciary duty to the corporation and its shareholders; when an entity is insolvent, the duties extend to creditors of the corporation. Committee of Unsecured Creditors v. Baldwin (In re Lemington Home for Aged), 659 F.3d 282, 290 (3d Cir. 2011) (citing Citicorp Venture Capital, Ltd. v. Comm. Of Creditors Holding Unsecured Claims, 160 F.3d 982, 987-88 (3d Cir. 1998)). A fiduciary duty is designed for the protection of the entire community of interests in the corporation, which includes creditors as well as stockholders. Brown v. Presbyterian Ministers Fund, 484 F.2d 998, 1005 (3d Cir. 1973) (citing Pepper v. Litton, 308 U.S. 295, 307 (1939)). As director and sole shareholder of the Debtor, from the Insolvency Date, EZIII owed a fiduciary duty to the Debtor's creditors. EZIII's fiduciary duty to the creditors is enforceable by the Trustee. Pepper v. Litton, 308 U.S. 295, 307 (1939).

Even if a director breaches his fiduciary duty, the business judgment rule provides a potential defense for the officer's or director's actions. The business judgment defense insulates an officer or director from liability only for decisions made:

> (1) in good faith; (2) where the director or officer is not interested in the subject of the business judgment; (3) is informed with respect to the subject of the business judgment to the extent he reasonably believes to be appropriate under the circumstances; and (4) rationally believes that the business judgment in question is in the best interest of the corporation.

Lampe, 665 F.3d at 516 (citing Viener v. Jacobs, 834 A.2d 546, 557 (Pa. Super. Ct. 2003)). However, where there is a prima facie showing that a director has self-interest in a particular corporate transaction, the business judgment rule does not apply and the burden shifts to the officer or director to demonstrate that the transaction is intrinsically fair. Stanger v. Athos Steel Aluminum, Inc. (In re Athos Steel & Aluminum, Inc.), 71 B.R. 525, 541 (Bankr. E.D. Pa. 1987) (citing Norlin Corp. v. Rodney, Pace, Inc., 744 F.2d 255, 264 (2d Cir. 1984)). For the reasons set forth below, EZIII breached his fiduciary duties of care and loyalty, and is not afforded the protection of the business judgment rule.

## 1.

EZIII breached his duty of care because he did not discharge his duties with the same diligence, care, and skill which ordinary prudent persons exercise in their personal affairs. "Whether the duty of care has been met is a question of fact to be determined by an examination of all the circumstances in the case." Lemington, 659 F.3d at 292 (citing Wolf v. Fried, 373 A.2d 734, 735

(1977)). While the Debtor was insolvent, EZIII caused the Debtor to make Loans to the Affiliated Entities without interest, repayment terms, fair consideration, collateral, or security, and while allowing uncollected ARs and unbilled WIP to accrue when the Debtor was in desperate need of cash. The circumstances of the case show that while the Debtor was insolvent, EZIII did not discharge his duties with the same diligence, care, and skill which ordinary prudent persons exercise in their personal affairs.

This Court rejects EZIII's argument that he did not breach his duty of care to the Debtor and its creditors because he was not "unjustly enriched." (Doc. #114, *Defendant's Post Trial Brief*, p. 10). In <u>Lampe</u>, the United States Court of Appeals for the Third Circuit explicitly stated, "The Courts have not required a showing of unjust enrichment in every case involving the...claim of breach of fiduciary duty predicated on the fiduciary's lack of due care." 665 F.3d at 516 (citing <u>Main</u>, 239 B.R. at 290 (holding that corporate directors breached their fiduciary responsibilities because they failed to show that the transactions were in the best interests of the company, without addressing whether those directors were unjustly enriched)). EZIII need not have been "unjustly enriched" to have breached his duty of care to the Debtor and its creditors; he breached his duty of care by mismanaging the Debtor to its detriment, and has failed to show that the transactions at issue here were in the best interest of the Debtor and its creditors.

<u>2.</u>

EZIII also breached his duty of loyalty. "A director's duty of loyalty necessitates that he not engage in self-dealing." Lampe, 665 F.3d at 518. Directors cannot use their position to obtain personal profit or advantage to advance their own interests. Id. (citing Tyler v. O'Neill, 994 F.Supp. 603, 612 (E.D. Pa. 1998)). Unlike the duty of care, the duty of loyalty claim requires this Court to consider whether EZIII was unjustly enriched by these transactions. Lampe, 665 F.3d at 516; see also InfoSAGE v. Mellon Ventures, L.P., 896 A.2d 616, 636-37 (Pa. Super. Ct. 2006) (holding, in the context of duty of loyalty where corporate directors are alleged to have breached their fiduciary obligation, the allegedly wrong-doing directors must have been unjustly enriched). The preponderance of the evidence demonstrates that EZIII was unjustly enriched, albeit indirectly, by these transactions.

"A showing of unjust enrichment requires a demonstration that: (1) a benefit was conferred on the defendant; (2) the defendant retained that benefit; and (3) it would be inequitable for the defendant to retain the benefit without paying full value for it." Lampe, 665 F.3d at 520 (citing Schenck v. K.E. David, Ltd., 666 A.2d 327, 328 (1995)). The Trustee must show that EZIII either wrongfully secured or passively received a benefit that would be unconscionable for him to retain without compensating the Debtor. Stout St. Funding LLC v. Johnson, CIV.A. 10-5634, 2012 WL 1994800 (E.D. Pa. June 4, 2012) (citations omitted). The Court will not focus on EZIII's intentions but whether he was unjustly enriched and the "unique factual circumstances" of the case. Id.

EZIII unjustly enriched himself by having the Debtor provide cash and services to the Affiliated Entities. EZIII had interests in the Affiliated Entities, and the Affiliated Entities used the benefits that the Debtor provided to complete their respective projects which directly benefitted EZIII. For example, as discussed above, EZIII personally guaranteed loans concerning the First Side Project, and had the Debtor provide services to ensure that the First Side Project project was headed towards completion. EZIII was clearly on both sides of these transactions. The evidence shows that EZIII appreciated, accepted, and retained the benefits that the Debtor conferred on the Affiliated Entities.  EZIII was unjustly enriched, and it would be inequitable for EZIII to retain the benefits the Debtor conferred while insolvent and in need of cash.

EZIII cannot rely on the business judgment rule as a defense to his fiduciary breaches.  Because there is a prima facie showing that EZIII had a self-interest in the Debtor's transactions, the business judgment rule does not apply and the burden shifts to EZIII to demonstrate that the transactions are intrinsically fair. In re Athos Steel & Aluminum, Inc., 71 B.R. at 541 (citing Norlin Corp. v. Rodney, Pace, Inc., 744 F.2d at 264). Pennsylvania law has codified this duty, in pertinent part:

> A contract or transaction between a business corporation and one or more of its directors or officers or between a business corporation and another domestic or foreign corporation for profit...in which one or more of its directors or officers are directors or officers or have a financial or other interest, shall not be void or voidable solely for that reason...if...the contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified by the board of directors or the shareholders.

15 Pa. Cons. Stat. Ann. § 1728. While EZIII argues a "long standing practice" of affiliates providing benefits to each other when needed, no evidence was presented that the Debtor ever benefitted from such transfers, or that such transfers were "fair as to the corporation" as required by 15 Pa.C.S.A. § 1728. EZIII breached his fiduciary duty owed to the Debtor, and has not presented any applicable affirmative defenses.

3.

A breach of fiduciary duty renders fiduciaries liable for resulting corporate losses. Lampe, 665 F.3d at 515 (citing Main, 239 B.R. at 291). The duty of reimbursement is limited to those losses which were proximately caused by the negligent and wasteful conduct of the defendant. Lampe, 665 F.3d at 517 (citing Selheimer v. Manganese Corp. of Am., 224 A.2d 634, 647 (Pa. 1966)). "Proximate causation is defined as 'a wrongful act which was a substantial factor in bringing about the plaintiff's harm.'" Lampe, 665 F.3d at 517 (citing Dudley v. USX Corp., 606 A.2d 916, 923 (Pa. Super. Ct. 1992)). In Pennsylvania, "[t]he measure of damages for breach of fiduciary duty is the profits lost by the corporation as a consequence of the breach." Donaldson v. Bernstein (In re Insulfoams, Inc.), 184 B.R. 694, 708 (Bankr. W.D. Pa. 1995) subsequently aff'd sub nom. Donaldson v. Bernstein, 104 F.3d 547 (3d Cir. 1997) (citing CST, Inc. v. Mark, 520 A.2d 469, 472 (Pa. Super. Ct. 1987)).

In the case at hand, the lost profits consist of the Loans and the uncollected ARs and unbilled WIP accrued during the period of insolvency. EZIII's wrongful acts of directing the Debtor to extend Loans and to not collect

the ARs and bill the WIP were substantial factors in bringing about the
Debtor's insolvency. The money that the Debtor would have retained, or
collected had the Affiliated Entities followed through on their end of the
bargain, amounts to the losses proximately caused by EZIII's breach of
fiduciary duty.

The Trustee requests damages for EZIII's breaches of fiduciary duty
occurring before the Insolvency Date under the theory that those breaches
resulted in the Debtor's insolvency. (Doc. #115, *Plaintiff's Post Trial Brief*, p.
22). In support of this contention, the Trustee cites Selheimer v. Manganese
Corporation of America, where the court held corporate directors personally
liable for pre-insolvency breaches of fiduciary duties resulting in losses causing
the corporation's insolvency. 423 Pa. 563, 580-81, 224 A.2d 634, 644 (1966).
The Trustee also quotes a footnote from Production Resources Group, LLC v.
NCT Group, Inc., 863 A.2d 772, 789 n.56 (Del. Ch. 2004) ("Once a firm
becomes insolvent, there is little doubt that creditors can press derivative
claims arguing that directors' pre-insolvency conduct injured the firm."), and
relies upon a similar statement from In re Main, 239 B.R. at 292
supplemented, 242 B.R. 574 (Bankr. E.D. Pa. 1999) aff'd in part, vacated in
part sub nom. Main, Inc. v. Blatstein, CIV. A. 00-CV-35, 2000 WL 1796417
(E.D. Pa. Nov. 28, 2000). (Doc. #115, p. 22).

Selheimer is distinguishable from the case at hand because the case was
a stockholders' derivative action, and stockholders are owed a fiduciary duty
pre-insolvency unlike creditors who are owed the duty post-insolvency. See

Lemington, 659 F.3d at 290. As for Production Resources and Main, this Court is not bound to follow either Delaware law or a decision of the U.S. Bankruptcy Court for the Eastern District of Pennsylvania and declines to do so here. Furthermore, neither of the statements from these cases that the Trustee relies upon provide any analysis as to how the Court could practicably and effectively measure damages for pre-insolvency conduct that injured creditors.

Prior to the point of insolvency, EZIII owed a fiduciary duty to the corporation and its shareholders, i.e. himself. Lemington, 659 F.3d at 290 (citing Citicorp, 160 F.3d at 987-88). As of the Insolvency Date forward, EZIII owed a fiduciary duty to the creditors of the Debtor. Id.  Since the Trustee serves the estate of the Debtor "with the best interests of parties in interest," 11 U.S.C. § 704, and the creditors are "parties in interest," the Trustee may only seek damages resulting from EZIII's breach of fiduciary duty to the creditors. Under Pennsylvania law, "[i]t is axiomatic that a plaintiff may not maintain a tort action against a defendant unless the law imposes on that defendant a duty to the plaintiff." 1 Summ. Pa. Jur. 2d Torts § 2:1 (2d ed.). See Peatross v. Southwark Minit-Man Corp., 202 A.2d 102 (Pa. 1964); Vickodil v. Com., Ins. Dept., 559 A.2d 1010 (Pa. Commw. Ct. 1989) (citing Moore v. Com., Dept. of Justice, 538 A.2d 111 (Pa. Commw. Ct. 1988)); DeRose v. Commercial Credit Co., 39 Pa. D. & C. 300 (C.P. 1941).  "Tort liability must be founded upon some blameworthy conduct or lack of due care resulting in the violation of a duty owing to others." 1 Summ. Pa. Jur. 2d Torts § 2:1 (2d ed.). See Kline v. Ball, 452 A.2d 727 (Pa. Super. Ct. 1982). Because the Debtor owed no duty to the

creditors until the Insolvency Date, the Trustee may only seek damages for the breaches of fiduciary duty occurring between the point of insolvency and the date of the filing of the petition.

In Insulfoams, the Honorable Bernard Makovitz calculates "lost profits" by subtracting profits the debtor actually received from the net profits earned on contracts. 184 B.R. at 708.   Although the types of transfers at issue in Insulfoams differ from the transfers at issue in the present case, we may follow the same mathematical approach by determining what profits EZIII proximately caused the Debtor to lose.

As of the Insolvency Date, the Loans amounted to $1,322,929. (Plaintiff's Exhibits 5, 6, 20).   Between the Insolvency Date and the Petition Date, the amount of the Loans had increased to $2,112,255. (Plaintiff's Exhibits 19, 20). As discussed above, making loans during the Debtor's period of insolvency was a breach of EZIII's fiduciary duty to the Debtor's creditors. Thus, damages amount to the loans made during that period: the outstanding loans as of the petition date, $2,112,255, less the outstanding loans at the Insolvency Date, $1,322,929, which totals $789,326.

As of the Insolvency Date, the Debtor's uncollected ARs and unbilled WIP amounted to $10,552,397. (Plaintiff's Exhibit 20). By the time of the Petition Date, the total amount of uncollected ARs and unbilled WIP had reached $14,314,340. (Plaintiffs Exhibits 19, 20). As discussed above, not collecting the ARs and not billing the WIP during the Debtor's period of insolvency was a breach of EZIII's fiduciary duties; but for this breach, the Debtor would not

have incurred the losses it did. Thus, damages are the amount of uncollected ARs and unbilled WIP accrued during the period of insolvency: the uncollected ARs and unbilled WIP as of the Petition Date, $14,314,340, less the uncollected ARs and unbilled WIP at the Insolvency Date, $10,552,397, which equals $3,761,943.

Thus, total damages are the loans made during the period of insolvency in addition to the uncollected ARs and unbilled WIP accrued during the period of insolvency, or $4,551,269.

<u>B.</u>

The Trustee has also proceeded on a count of deepening insolvency against EZIII. Although Pennsylvania Supreme Court has yet to formally recognize a deepening insolvency cause of action, the United States Court of Appeals for the Third Circuit has found that "the Pennsylvania Supreme Court would determine that 'deepening insolvency' may give rise to a cognizable injury." <u>Lemington</u>, 659 F.3d at 293-94 (citing <u>Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.</u>, 267 F.3d 340, 349 (3d Cir. 2001)). In Pennsylvania, deepening insolvency is "an injury to [a debtor's] corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life." <u>Lemington</u>, 659 F.3d at 294 (citing <u>Seitz v. Detweiler</u> (<u>In re CitX Corp.</u>), 448 F.3d 672, 677 (3d Cir. 2006)). For such a claim to succeed, it is necessary to demonstrate that the Debtor was insolvent and that EZIII proximately caused the Debtor to take on more debt resulting in injury to the creditors. <u>Id.</u> (citing <u>CitX</u>, 448 F.3d at 678). Furthermore, fraud is necessary to

support a claim of deepening insolvency, and "a claim of negligence cannot sustain a deepening-insolvency cause of action." Id. (citing CitX, 448 F.3d at 681).

> In Pennsylvania,
>
> [a]s a general rule, fraud consists in anything calculated to deceive, whether by single act or combination, or by suppression of truth, or a suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture.  It is any artifice by which a person is deceived to his disadvantage.

Id. (citing In re Reichert's Estate, 51 A.2d 615, 617 (1947)).

In this case, while the Trustee has proven that certain assets of the Debtor were overvalued and that the Affiliated Transactions amounted to a breach of EZIII's fiduciary duty, the Trustee has not shown any element of deceit on the part of EZIII. (See Memorandum Opinion, Section V, Subsection B, infra, for actual fraud discussion.) Simply stated, this Court does not find that poor business decisions are per se tantamount to fraudulent or deceitful conduct. In fact, nothing exists in the record which would suggest that EZIII overvalued assets to deceive his lenders or hid from creditors the fact that the AR and WIP was due from Affiliated Entities. Under these circumstances, the Trustee has not met her burden of proof for deepening insolvency.

## **V.**

In adversary proceeding 11-2123-JAD, the Trustee asserts a fraudulent transfer cause of action against Hillcrest, the recipient of a $150,000 transfer made by the Debtor on July 11, 2007 ("the Hillcrest Transfer"). The Hillcrest

Transfer is an avoidable fraudulent transfer pursuant to 11 U.S.C. § 548, which states in pertinent part as follows:

> (a)(1) The trustee may avoid any transfer...incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily-
>
> (A) made such transfer...with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
>
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer; and
>
> (ii)(I) was insolvent on the date that such transfer was made...or became insolvent as a result of such transfer.

To avoid a fraudulent transfer, a trustee may show either an intentional fraudulent transfer, 11 U.S.C. § 548(a)(1)(A), or a constructive fraudulent transfer, 11 U.S.C. § 548(a)(1)(B). A trustee must show a constructive fraudulent transfer by a preponderance of the evidence. Liebersohn v. Campus Crusade for Chris, Inc. (In re C.F. Foods, L.P.), 280 B.R. 103, 115 (Bankr. E.D. Pa. 2002). Although there is a split of opinion as to the proper burden of proof in an intentional fraudulent transfer cause of action, this Court is of the opinion that, pursuant to Grogan v. Garner, the proper standard of proof is also by a preponderance of the evidence. In applying the preponderance standard to fraud claims brought under 11 U.S.C. § 523, the Grogan Court held that "[b]ecause the preponderance of the evidence standard results in a roughly equal allocation of the risk of error between litigants we presume that

this standard is applicable in civil actions between private litigants unless particularly important individual interests are at stake." 498 U.S. 279, 286, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991). Although the <u>Grogan</u> court did not directly address transfer avoidance, this Court finds that the same rule governs the Trustee's instant action under § 548(a)(1)(A). <u>See Dobin v. Hill</u> (<u>In re Hill</u>), 342 B.R. 183, 197 (Bankr. D.N.J. 2006); David B. Young, <u>Preferences and Fraudulent Transfers</u>, 849 PLI/Comm 729, 860-62 (2008) ("The strong current of opinion now holds that actual fraudulent intent under 11 U.S.C. § 548(a)(1)(A) need only be shown by a preponderance of the evidence. ... most decisions since <u>Grogan</u> have held that the same rule governs in actions under § 548(a)(1)(A).").

<u>A.</u>

To prevail under a fraudulent transfer claim pursuant to 11 U.S.C. § 548, the $150,000 transfer to Hillcrest must qualify as a "transfer" within the meaning of 11 U.S.C. § 548. "Transfer" has a broad definition: "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property." 11 U.S.C. §§ 101(54)(D)(i), (ii). It is not disputed that the Hillcrest Check Register reflects a $150,000 deposit. (Adv. No. 11-2123, Doc. #8, ¶ 4)[12]. Hillcrest avers that the $150,000 was a loan from the Debtor that Hillcrest did not repay, while the

---

[12] All future docket citations refer to Adversary Number 11-2123-JAD, unless otherwise specifically noted.

Trustee contends that the payment is an avoidable fraudulent transfer

pursuant to 11 U.S.C. § 548. (Doc. #1, *Complaint*, ¶¶ 10-16).

The United States Court of Appeals for the Third Circuit has stated:

> For "disbursements to constitute true loans there must have been,
> at the time the funds were transferred, an unconditional obligation
> on the part of the transferee to repay the money, and an
> unconditional intention on the part of the transferor to secure
> repayment." In the absence of direct evidence of intent, the nature
> of the transaction may be inferred from its objective
> characteristics, including the presence or absence of debt
> instruments, collateral, interest provisions, repayment schedules
> or deadlines, book entries recording loans balances or interest
> payments, actual repayments, and any other attributes indicative
> of an enforceable obligation to repay the sums advanced. Where …
> the transactions occur between related entities rather than at
> arms' length, they are "subject to particular scrutiny because the
> control element suggests the opportunity to contrive a fictional
> debt." Thus, a transaction must be measured against an "objective
> test of economic reality" and characterized as a bona fide loan only
> if its "intrinsic economic nature" is that of a genuine indebtedness.

Geftman v. C.I.R., 154 F.3d 61, 68 (3d Cir. 1998) (citations omitted).

The intent of the Debtor and Hillcrest concerning repayment of the

$150,000 is not clear. Since the Debtor and Hillcrest are related entities, the

court reviews the Hillcrest Transfer with "particular scrutiny." The "objective

characteristics" of the transaction show that the Hillcrest Transfer is not a true

loan. The record shows that a debt instrument is absent, Hillcrest put up no

collateral, the Transfer was made interest-free, there was no repayment

schedule, and Hillcrest never made any actual payments to the Debtor. (See

Plaintiff's Exhibit 5). The record also shows that Hillcrest was never genuinely

indebted to the Debtor. The Hillcrest Transfer fails the "objective test of

economic reality"; this Court finds that the Hillcrest Transfer is not a loan, and is a transfer for purposes of 11 U.S.C. § 548.

<u>B.</u>

The Trustee attempts to prove that the Hillcrest Transfer was intentionally fraudulent under §548(a)(1)(A), but cannot meet her burden. The Trustee has shown that the Hillcrest Transfer was an interest of the Debtor made within two years of the bankruptcy filing, but must also show that this transfer was made "with actual intent to hinder, delay, or defraud" creditors.

Since a debtor is unlikely to admit that its intent was fraudulent, the Court must determine if sufficient "badges of fraud" are present, from which the Court may find fraudulent intent. <u>McNamara v. PFS</u> (<u>In re Pers. & Bus. Ins. Agency</u>), 334 F.3d 239, 243 (3d Cir. 2003). This Court has accepted the theory "that badges of fraud represent circumstances that so frequently accompany fraudulent transfers that their very presence may give rise to an inference of intent." <u>In re Lockwood Auto Group, Inc.</u>, 450 B.R. at 571 (Bankr. W.D. Pa. 2011) (citing <u>Dobin v. Hill</u> (<u>In re Hill</u>), 342 B.R. 183, 198 (Bankr.D.N.J.2006)).

"Courts have used varying lists of badges of fraud" to infer fraudulent intent. <u>In re Lockwood Auto Group, Inc.</u>, 450 B.R. 557, 571 (Bankr. W.D. Pa. 2011). For example, the Trustee cites to <u>In re FBN Food Services, Inc.</u>, wherein the court set forth the following six badges of fraud, all of which the Trustee alleges are present in the instant case: (1) the absconding with the proceeds of the transfer immediately after their receipt, (2) the absence of consideration when the transferor and transferee know that outstanding creditors will not be

paid, (3) the huge disparity in value between the property transferred and the consideration received, (4) the fact that the transferee was an officer, or an agent or creditor of an officer of an embarrassed corporate transferor, (5) the insolvency of the debtor, and (6) the existence of a special relationship between the debtor and the transferee. (Doc. #28, *Plaintiff's Post Trial Brief*, p. 5) (citing Carmel v. River Bank America (In re FBN Food Services, Inc.), 185 B.R. 265, 275 (Bankr. N.D.Ill. 1995)).

Another source can be found in the Pennsylvania Fraudulent Transfers Act, codified at 12 Pa. C.S.A. § 5104, which sets forth a list of eleven badges of fraud. To comprehensively analyze whether the Debtor actually intended to hinder, delay or defraud creditors, this Court will consider all eleven badges of fraud set forth within 12 Pa. C.S.A. § 5104(b), which include the six badges Plaintiff alleges in *Plaintiff's Post Trial Brief* (See Doc. #28).

The first badge of fraud listed in 12 Pa. C.S.A. § 5104(b) is "the transfer or obligation was to an insider."[13] Pursuant to 11 U.S.C. § 101(31)(B), the term "insider" includes, if the debtor is a corporation, a director, officer, or general partner of the debtor, a person in control of the debtor, a partnership in which the debtor is a general partner, or a relative of a general partner, director, officer, or person in control of the debtor. EZIII was the sole controlling officer and President of the Debtor and the 50% owner of Hillcrest, and the Debtor

---

[13]This badge of fraud is presented in *Plaintiff's Post Trial Brief* (Adv. 09-2123, Doc. #28, p. 5) as "(4) The fact that the transferee was an officer, or an agent or a creditor of an officer of an insolvent transferor," and "(6) The existence of a special relationship between the debtor and the transferee."

and Hillcrest acted as partners in construction projects such as 151 First Side. While this relationship may not precisely satisfy the statutory definition of "insider", other courts have found a badge of fraud in a "close relationship" between the debtor and the transferee. See In re Lockwood, 450 B.R. at 571. A close relationship between Hillcrest and the Debtor is undeniable; both entities are controlled by members of the Zambrano family, or by other entities controlled by members of the Zambrano family, and frequently acted as business partners with each other and the other Affiliated Entities for various investments and projects. This badge of fraud is satsified.

The second badge of fraud contained in 12 Pa. C.S.A. § 5104(b) is "the debtor retained possession or control of the property transferred after the transfer." This has not been asserted and clearly did not exist in this case.

Similarly, § 5104(b)(3) asserts fraud can be inferred where "the transfer or obligation was disclosed or concealed," which the Trustee does not assert. Furthermore, the Hillcrest Transfer appears on both entities balance sheets, suggesting in the alternative that the transfer was not concealed.

This Court also finds the badge of fraud contained in § 5104(b)(4), "before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit," not present in the instant case. The Hillcrest Transfer occurred on July 11, 2007, approximately one and a half years prior to the filing of the involuntary bankruptcy petition on January 26, 2009. No evidence of any other litigation was presented to this Court.

The fifth badge of fraud listed in 12 Pa. C.S.A. § 5104(b) is "the transfer was of substantially all the debtor's assets." The Debtor's September 30, 2007 Financial Statement reflects $17,380,699 in total assets for 2007, revealing that the Hillcrest Transfer was not substantially all of the Debtor's assets.

Consideration may also be given to whether "the debtor absconded" with the transferred assets, listed at § 5104(b)(6).[14] Although the Trustee argues the existence of this badge of fraud, the record does not show that the Debtor absconded with the proceeds of the Hillcrest Transfer.

The seventh badge of fraud under 12 Pa. C.S.A. § 5104(b), "the debtor removed or concealed assets," has also not been asserted or proven, and does not exist here.

The next badge of fraud listed in 12 Pa. C.S.A. § 5104(b) is "the value of the consideration received by the debtor was [not] reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred."[15] It is undisputed that Hillcrest never returned the $150,000 to Debtor, and, in exchange for the transfer, Debtor received only a minimal benefit in the form of profit expectation, if anything at all. (See *Memorandum Opinion,* Subsection C,

---

[14]This badge of fraud is presented in *Plaintiff's Post Trial Brief* (Adv. 09-2123, Doc. #28, p. 5) as "(1) The absconding with the proceeds of the transfer immediately after their receipt."

[15]This badge of fraud is presented in *Plaintiff's Post Trial Brief* (Adv. 09-2123, Doc. #28, p. 5) as "(2) The absence of consideration when the transferor and the transferee know that outstanding creditors will not be paid," and "(3) The huge disparity in value between the property transferred and the consideration received."

*infra*, for "reasonably equivalent value" discussion.)  This Court therefore finds this eighth badge of fraud satisfied.

The ninth badge of fraud, "the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred," is also satisfied.[16] The Hillcrest Transfer occurred on July 11, 2007, approximately two and a half months prior to the Debtor's date of insolvency, which this Court finds to be "shortly after the transfer was made." However, EZIII testified at trial that he believed that the Debtor's 2007 Financial Statements, which indicate the Debtor's liabilities exceeded its assets, was not a cause for concern (See Audio Recording of Hearing Held in Courtroom D, February 13, 2012 (1:55 - 1:57 PM)), and he did not see the 2007 Financial Statement until March or April of 2008, eight to nine months after the transfer (See id. at (1:51 - 1:53 PM)).  While this Court finds this factor satisfied, its existence may not predominantly prove EZIII's fraudulent intent, as it is possible that the transfer was made by EZIII without knowledge of the Debtor's insolvency.

The tenth badge of fraud, codified at 12 Pa. C.S.A. § 5104(b)(10), is "the transfer occurred shortly before or shortly after a substantial debt was incurred." The Trustee does not allege the presence of this badge, and while parties testified at trial that various projects and partnerships failed to thrive as the Debtor had expected in 2008 and 2009, no direct evidence of the

---

[16]This badge of fraud is presented in *Plaintiff's Post Trial Brief* (Adv. 09-2123, Doc. #28, p. 5) as "(5) The insolvency of the debtor."

Debtor's incurring a substantial debt around the time of the Hillcrest Transfer was presented to satisfy this factor.

The final badge of fraud in 12 Pa. C.S.A. § 5104(b) is "the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor." This badge is not satisfied here, as Hillcrest is not a lienor. Although EZIII initially alleged that the Hillcrest Transfer was paid to Hillcrest in consideration for a prior loan from Hillcrest to the Debtor, EZIII abandoned this unsubstantiated argument to assert that the transfer was a loan to Hillcrest, making the Debtor a lienor of Hillcrest's. It is also unlikely that $150,000 could be considered "essential assets" of the business. Thus, this final badge is not satisfied.

When considering whether the Trustee has met her burden of proof in proving an intentional fraudulent transfer, the Court must not mechanically review the badges of fraud but instead use the badges to help review the circumstances of a transfer to deduce the intent of the transfer. Id. Factors beyond those enumerated can be considered. In re C.F. Foods., L.P., 280 B.R. at 109 (Bankr. E.D. Pa. 2002).

Although this Court finds three badges of fraud in this case, the Trustee has not proven that EZIII acted with actual fraudulent intent. The Honorable Bernard Markovitz came to a similar conclusion in In re Arbogast, where the court considered the same eleven badges of fraud in considering a fraudulent

transfer action under 12 Pa. C.S.A. § 5104(b).[17] <u>Cardiello v. Arbogast</u> (<u>In re Arbogast</u>), 466. B.R. 287, 313 (Bankr. W.D. Pa. 2012). Of the statute's eleven enumerated badges of fraud, the court found factors (1), (2), (4), (8), (9) and (10) satisfied. <u>Id</u>. However, the court held that the Trustee did not meet its burden and did not find actual fraud, holding, "[t]hat many of the factors set forth in § 5104(b) are satisfied … does not satisfy the [c]ourt –i.e., does not operate so that the Trustee predominantly proves- that the [d]ebtor intended to hinder, delay, or defraud." <u>Id</u>.

Similarly, in this case, it is not necessarily sufficient that three factors are present; the significance of each existing badge of fraud must be considered. Here, the three factors do not predominantly prove that EZIII acted with actual fraudulent intent. The transfer was to an affiliated entity, but these entities had a history of such inner-company loans; the value of consideration received was not reasonably equivalent to the value of the transfer, but EZIII may have had a reasonable expectation of some value accruing from the transfer (<u>See</u> *Memorandum Opinion*, Subsection C, *infra*); and the transfer was made shortly before the Debtor became insolvent, but before EZIII reviewed the September 30, 2007 Financial Statement. For these reasons, this Court finds that the Trustee has not proven the Debtor's actual fraudulent intent under 548(a)(1)(A).

---

[17] An analysis of a claim brought pursuant to 12 Pa. Cons. Stat. Ann. § 5104(a) is comparable to that of one under § 548(a)(1).  See <u>Bohm v. Dolata</u> (<u>In re Dolata</u>), 306 B.R. 97, 115  (Bankr. W.D. Pa. 2004) (11 U.S.C. § 548(a)(1) and 12 Pa.C.S.A § 5104(a) are to be construed consistent with one another to the extent that the language of each parallels the other).

<u>C.</u>

In the event that a trustee cannot meet the burden of showing an intentional fraudulent transfer, 11 U.S.C. § 548 permits a trustee to legally impute that a transfer is fraudulent. The Trustee has shown that a constructive fraudulent transfer exists in the instant case pursuant to § 548(a)(1)(B)(i) and (ii)(I), under which the Trustee may avoid any transfer of an interest of the debtor that was made or incurred on or within two years before the date of the filing of the petition, if the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation," and "was insolvent on the date that such transfer was made ... or became insolvent as a result of such transfer or obligation."  11 U.S.C. § 548(a)(1)(B).

The Trustee has the burden of proving each of these requirements by a preponderance of the evidence. <u>Pension Transfer Corp. v. Beneficiaries</u> (<u>In re Freuhauf Trailer Corp.</u>), 444 F.3d 203, 211 (3d Cir. 2006). To prevail, the Trustee must demonstrate that: (1) debtor had an interest in property; (2) the interest was transferred within two years of the petition date; (3) debtor was insolvent when the transfer occurred or was made insolvent as a result of the transfer; and (4) debtor received "less than a reasonably equivalent value in exchange for such transfer". <u>Mellon Bank v. Official Committee of Unsecured Creditors of RML, Inc. (In re RML, Inc.</u>), 92 F.3d 139, 144 (3d Cir 2006).

The Trustee has shown that the Debtor had an interest in the $150,000 it transferred from its account to Hillcrest, and that the transfer occurred within two years of the petition date while the Debtor was insolvent or became

insolvent as a result of such transfer or obligation. The remaining issue is thus whether the Debtor received less than a reasonably equivalent value in exchange for this transfer.

To conclude whether the value received was "reasonably equivalent" to the value of the transfer, courts must first make "an express factual determination as to whether the debtor received any value at all." In re RML, 92 F.3d at 149. "Of the three words comprising the phrase 'reasonably equivalent value' in § 548(a), only the last is defined." Cardiello v. Casale (In re Phillips Group, Inc.), 382 B.R. 876, 887 (Bankr. W.D. Pa. 2008). "For purposes of § 548(a), 'value' means 'property, or satisfaction or securing of a present or antecedent debt of the debtor." Id. (citing 11 U.S.C. § 548(d)(2)(A)). We have interpreted "value" to include "any benefit[,] … whether direct or indirect." In re RML, 92 F.3d at 150. "The mere 'opportunity' to receive an economic benefit in the future constitutes 'value' under the [Bankruptcy] code." Id. at 148. Thus, the initial question in this analysis is whether the Debtor received any value, direct or indirect, from the Hillcrest Transfer.

EZIII attests that in exchange for the Hillcrest Transfer, the Debtor received an "expectation" of a "substantial profit" from the partnership investment. (Doc. #27, *Defendant's Post Trial Brief,* p. 6). The In re RML court held that "money spent on investments that fail to stabilize or improve the debtor's condition (i.e., 'losing' investments) can confer value within the meaning of § 548(a)(2) of the Code … so long as there is some chance that a contemplated investment will generate a positive return at the time of the

disputed transfer." In re RML, 92 F.3d at 152. The In re RML court recognized that "requiring that all investments yield a positive return in order to find that they conferred value on the debtor would be unduly restrictive[, b]ut so, too, would a rule insulating from § 548's coverage investments that, when made, have zero probability of success." Id.

Here, there was some chance that the investment would generate positive value upon the Debtor, once the partnership began distributions.[18] Because investments, even those that eventually fail, can be held to confer value under § 548, this Court views these facts in the light most favorable to the Debtor and finds that a value was conferred. This Court will next determine whether that value was "reasonably equivalent" to the $150,000 transfer.

The Fruehauf court held that, "if a court determines that the debtor gained at least some value as a result of the transfer, what follows is a comparison: whether the debtor got roughly the value it gave." In re Fruehauf Trailer Corp., 444 F.3d at 212-13. "In conducting this factual analysis, a court does look to the 'totality of the circumstances,' including (1) the 'fair market value' of the benefit received as a result of the transfer, (2) 'the existence of an arm's-length relationship between the debtor and the transferee,' and (3) the transferee's good faith." In re Fruehauf Trailer Corp., 444 F.3d at 213 (citing In

---

[18]EZIII testified that he expected Zambrano Corporation to receive an investment balance of $2 million when the project completed. (Audio Recording of Hearing Held in Courtroom D, February 13, 2012 (1:38 PM)). He further testified that "inner-company loans" between the related entities dated back to at least the 1970's, and were repaid either through refinancing or project profits. Thus, it is possible that the Debtor would have been repaid, thus conferring potential, albeit minimal, value. (Id. at (1:25 – 1:26 PM)).

re RML, 92 F.3d at 148-49, 153). "Where a court has sufficient evidence to conclude, based on the totality of the circumstances, that the benefits to the debtor are minimal, and certainly not equivalent to the value of a substantial outlay of assets, the plaintiff need not prove the precise value of the benefit because such a calculation is unnecessary to the court's analysis." In re Fruehauf Trailer Corp., 444 F.3d at 214.

The instant case is similar to In re RML, where the court held that the value a debtor corporation received from a bank's conditional commitment letter for a loan which ultimately failed to close was not reasonably equivalent to the fees paid to the bank in exchange for the letter. In re RML, 92 F.3d at 148. Because "there was at least some chance" that the letter would be fulfilled and the debtor would receive a future economic benefit, the court found that value was conferred, but noted, "[w]hile the chance of receiving an economic benefit is sufficient to constitute 'value,' the size of the chance is directly correlated with the amount of 'value' conferred." Id. at 153. The court then relied on the totality of the circumstances test and compared the value that was actually conferred to the fees paid in exchange.  Because the bank's loan never materialized, the court found that the "highly conditional" letter did not actually confer value and therefore the fees paid in exchange were not reasonably equivalent in value. Id. at 154.

Here, the Debtor paid $150,000 for the chance to receive a future partnership distribution, but the actual value conferred to the Debtor was zero. Under the totality of the circumstances, this Court finds that the 'fair market

value' of the benefit received as a result of the transfer was zero.   This conclusion is particularly acute because (1) the relationship between the Debtor and the transferee was not one of "arm's-length", and (2) the transferee's good faith is in question, due to Hillcrest's failure to return the money as agreed to upon the partnership's first distribution. Because the Debtor did not receive reasonably equivalent value in exchange for the Hillcrest Transfer, the Hillcrest Transfer is avoidable.

<u>D.</u>

In addition to the unpersuasive affirmative defenses concerning both this Court's subject matter jurisdiction and the Trustee's standing to bring this adversary pleading, as discussed above, Hillcrest argues that the Hillcrest Transfer was made in the "ordinary course of business." This defense is also without merit. This defense specifically applies to 11 U.S.C. § 547 pertaining to preferences. While it may be true that the Debtor ordinarily made such transfers, its defense is irrelevant to a fraudulent transfer cause of action.

In support of its contention, Hillcrest cites <u>Ario v. Ingram Micro, Inc.</u>, 965 A.2d 1194 (Pa. 2009) and <u>Hechinger Investment Company of Delaware, Inc. v. Universal Forest Products, Inc.</u> (<u>In re Hechinger Inv. Co. of Del., Inc.</u>), 489 F.3d 568 (3d Cir. 2007).   However, neither case is applicable to the case at hand. In <u>Ario</u>, the court was evaluating a preference avoidance under the Pennsylvania statutory scheme for the liquidation of insolvent insurance companies, and in <u>Hechinger</u>, 11 U.S.C. § 547 was at issue. As neither case pertains to fraudulent

transfers under 11 U.S.C. § 548, Hillcrest's "ordinary course of business" argument provides no defense to the fraudulent transfer at issue.

## VI.

The Trustee also alleged that the Debtor made constructively fraudulent transfers for the benefit of EZJr and Mary pursuant to 11 U.S.C. § 548(a)(1)(B). Initially, the Trustee alleged that the Debtor made intentional fraudulent transfers, pursuant to 11 U.S.C. § 548(a)(1)(A), and preferences, pursuant to 11 U.S.C. § 547, to EZJr. The Trustee abandoned the intentional fraudulent transfers claim. Preferences do not apply, because it is undisputed that EZJr was not a creditor of the Debtor. (Adv. No. 11-2122, Doc. #13, *Pretrial Statement Required By April 6, 2011, Scheduling Order*, ¶¶ 16-17).[20]

The transfers at issue are several checks totaling $53,700 (collectively, the "EZJr Transfers") from the Debtor for the rental of the Condo Unit; EZJr was the lessee of the Condo Unit. As discussed above, to avoid a fraudulent transfer, a trustee may show a constructive fraudulent transfer. 11 U.S.C. § 548(a)(1)(B). A trustee must show a constructive fraudulent transfer by a preponderance of the evidence. In re C.F. Foods, L.P., 280 B.R. at 115 (Bankr. E.D. Pa. 2002) (citations omitted).

Section 550 of the Bankruptcy Code governs the liability of the transferee of an avoided transfer:

(a)    Except as otherwise provided in this section, to the extent that a transfer is avoided under section...548...of this title, the trustee may

---

[20] All future docket citations refer to Adversary Number 11-2122-JAD, unless otherwise specifically noted.

recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from-

> (1)    The initial transferee of such transfer or the entity for whose benefit such transfer was made....

11 U.S.C. § 550(a)(1). Here, the Trustee seeks to avoid the EZJr Transfers, pursuant to 11 U.S.C. § 548, and recover the value of the Transfers from "the entity for whose benefit such transfer was made," pursuant to 11 U.S.C. § 550. It is undisputed that the Debtor paid for the rental of the Condo Unit and that EZJr was the tenant. (Doc. #13, ¶¶ 1-8). In this case, "the entity for whose benefit such transfer was made" is EZJr. The parties do not dispute that the Transfers occurred. (Id.). The Debtor was subjected to an involuntary petition filed on January 26, 2009; the Transfers fall within the two-year statutory limit prior to the filing of the petition.

### A.

The Trustee has shown a constructive fraudulent transfer exists in the instant case pursuant to § 548(a)(1)(B)(i) and (ii)(I), under which the Trustee may avoid any transfer of an interest of the debtor that was made or incurred on or within two years before the date of the filing of the petition, if the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation," and "was insolvent on the date that such transfer was made ... or became insolvent as a result of such transfer or obligation."

In analyzing a transfer under § 548(a)(1)(B), "before determining whether the value was 'reasonably equivalent' to what the debtor gave up, the court must make an express factual determination as to whether the debtor received

any value at all." In re RML, 92 F.3d at 149. A court must consider whether,

"'based on the circumstances that existed at the time' of the transfer, it was

'legitimate and reasonable' to expect some value accruing to the debtor." In re

Fruehauf Trailer Corp., 444 F.3d at 212 (referencing In re RML, 92 F.3d at

152). Based on the circumstances which existed at the time of the transfer, the

Debtor received no value from the EZJr Transfers, and had no legitimate and

reasonable expectation of value to accrue as a result of the EZJr Transfers.

EZJr maintains that the Debtor did receive reasonable equivalence in

value for the EZJr Transfers. According to EZJr, EZIII bought EZJr's interests

in the Debtor as well as in the Affiliated Entities. (Adv. No. 09-2045

Defendant's Exhibit S). EZJr claims that in consideration for this transaction,

Hillcrest agreed to pay a monthly annuity to EZJr pursuant to the Annuity

Contract, and the Debtor agreed to pay EZJr's condominium fees. (Doc. #32,

*Defendant's Post-Trial Brief*, p. 3). However, by the time of the EZJr Transfers,

EZJr had not been involved with the business of the Debtor for about half a

decade. The Annuity Contract between EZJr and Hillcrest is dated December

16, 2003, and explicitly details that EZJr is to receive a monthly annuity from

Hillcrest. It makes no mention of the Debtor making payments to EZJr, and in

fact, contains a merger clause stating that the Annuity Contract constituted

the entire agreement. (Id.). Moreover, the record shows no evidence that the

Debtor was in any way obligated to pay for EZJr's vacations or received any

value whatsoever for paying for the vacations. Furthermore, the EZJr Transfers

occurred while the Debtor was insolvent, as discussed above, and are avoidable.

B.

EZJr has asserted three affirmative defenses against the Trustee's argument that he is a fraudulent transferee:

    (a)    The payments were made in the ordinary course of business;

    (b)    The claim for the 2007 payments are time barred; and

    (c)    The claims against Mary Zambrano lack merit.

EZJr's "ordinary course of business" defense is without merit for the same reasons that defense didn't pass muster for Hillcrest, as discussed above.

With respect to the defense of time-bar, EZJr claims that one EZJr Transfer, made November 8, 2007, is time barred. However, the Trustee pursued the claim under 11 U.S.C. § 548, under which trustees may avoid transfers made on or within two years before the date of the filing of the petition. In this case, the petition was filed January 26, 2009, and the Transfer of November 8, 2007 falls within the statutory 2 years before January 26, 2009.

With respect to EZJr's wife, the Trustee argues that Mary is also liable. Initially, the Trustee averred that Mary was a beneficiary of the Transfers. The Trustee based the argument on the fact that EZJr signed leases specifying that two people were to occupy the Condo Unit. (See Defendants' Exhibit C). However, the lease did not specify who those two people were. (See id.) The parties do not dispute that Mary did not sign the leases, was not listed as an

occupant on the leases, and had no involvement or participation in the arrangements to obtain the leases. (Doc. #13, ¶ 18-21). Moreover, Mary traveled to the Condo Unit infrequently. (Id. at ¶ 22). Furthermore, EZJr stated that the Condo Unit was for his use and the possible addition of a guest, not necessarily Mary, who had no legal right to use the Condo Unit. (Defendants' Exhibit E, pp. 4, 11). Thus, Mary is not an "entity for whose benefit such transfer was made" under 11 U.S.C. § 550; she received no advantage, privilege, profit, or gain.

Since Mary is not a beneficiary under 11 U.S.C. § 550, the Trustee attempts to invoke the Pennsylvania doctrine of "necessaries" pursuant to 23 Pa.C.S. § 4102, by alleging that the Condo Unit is a "necessary." This Court has acknowledged the doctrine of necessaries. Cardiello v. Arbogast (In re Arbogast), 466 B.R. 287, 308-09 (Bankr. W.D. Pa. 2012); Zebley v. Olexa (In re Olexa), 317 B.R. 290, 294 (Bankr. W.D. Pa. 2004) (citing Gimbel Brothers, Inc. v. Pinto, 188 Pa.Super 72, 145 A.2d 865, 869 (1958)). Under this doctrine, when debts are contracted by one spouse for "necessaries" for the support and maintenance of the family, creditors may proceed against both spouses directly for the debts. 23 Pa.C.S. § 4102. The scope of "necessaries" are not restricted to "bare necessities," but rather "includes those things needed and suitable to the rank and condition of the spouses and the style of life they have adopted." Gimbel Bros., Inc. v. Pinto, 188 Pa. Super. at 78, 145 A.2d at 869. The Trustee, specifically citing Gimbel Brothers, alleges that the Condo Unit is a "necessary," and as a result, Mary and EZJr are both liable for the value of the

-49-

Transfers. (Doc. #15, *Plaintiff's Pre-Trial Memorandum,* pp. 5-6). This Court finds this argument unpersuasive.

First, the <u>Gimbel Brothers</u> decision, and <u>Olexa</u> which relies on <u>Gimbel Brothers</u>, are not fraudulent transfer cases and cannot be cited for the proposition that what constitutes a necessity for fraudulent transfer purposes is the same as what constitutes a necessary within the doctrine of necessaries. <u>See</u> <u>In re Arbogast</u>, 466 B.R. at 309. Furthermore, pursuant to the language of § 4102, which begins with, "In all cases were debts are contracted for necessaries by either spouse," the doctrine of necessaries applies only where debts are contracted by either spouse. 23 Pa.C.S. § 4102. Here, neither EZJr nor Mary contracted a debt; the argument is inapplicable.  Thus, the Trustee's claims against Mary are without merit.

## VI.

In summary, the Debtor was insolvent as of September 30, 2007; the Debtor's liabilities far exceeded its assets. While the Debtor was insolvent, EZIII breached his fiduciary duty to the Debtor's creditors; from the Insolvency Date until the Petition Date, the Debtor continued to accumulate debt by providing cash and services to the Affiliated Entities and allowing ARs to go uncollected and WIP to remain unbilled. EZIII breach his duty of care by mismanaging the Debtor and breached his duty of loyalty by engaging in self-dealing. Damages for EZIII's breach of fiduciary duty are the amount of lost profits accumulated during the period of insolvency, totaling $4,551,269.

The Trustee has not met her burden to prove deepening insolvency against EZIII. Although the Debtor continued to accumulate debt during the period of insolvency to the detriment of the Debtor's creditors, the Trustee has not shown that EZIII acted fraudulently or with any intent to deceive the Debtor's creditors.

Hillcrest is liable for the Hillcrest Transfer of $150,000 under 11 U.S.C. § 548. The Hillcrest Transfer was not a legitimate loan, but was also not an intentional fraudulent transfer. Instead, the Trustee has imputed that the Hillcrest Transfer was a constructive fraudulent transfer. The Debtor made the Hillcrest Transfer while the Debtor was insolvent for unreasonably unequal value in return. Hillcrest's defense that the Debtor made such transfers in the ordinary course of its business is without merit.

EZJr is liable for the EZJr Transfers amounting to $57,000 under 11 U.S.C. § 548. Although not a direct transferee, EZJr is still liable as the beneficiary of the EZJr transfers under 11 U.S.C. § 550. The EZJr Transfers are constructive fraudulent transfers because the Debtor made the EZJr Transfers while the Debtor was insolvent for unreasonably unequal value in return. EZJr's other defenses are without merit. However, EZJr is correct in asserting that Mary is not liable for the avoidable fraudulent transfer.

An appropriate order shall be entered.


**Date**: September 17, 2012          /s/ Jeffery A. Deller
                                      **JEFFERY A. DELLER**
                                      United States Bankruptcy Judge

**CASE ADMINISTRATOR TO SERVE:**

    Owen Katz, Esq.
    James Cooney, Esq.
    Rosemary Crawford, Esq.
    Office of U.S. Trustee